# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KELLY MEDLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **Case No. 1:14CV49NCC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Kelly Medley (Plaintiff) for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. Plaintiff has filed a brief in support of the Complaint. (Doc. 13). Defendant has filed a brief in support of the Answer. (Doc. 20). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). (Doc. 7).

## I.
## PROCEDURAL HISTORY

On August 12, 2011, Plaintiff filed her application for SSI, alleging a disability onset date of October 4, 2004. (Tr. 145-51). Plaintiff's application was denied, and she requested a hearing before an Administrative Law Judge (ALJ).

(Tr. 88-91, 96).  After a hearing, by decision, dated July 22, 2013, the ALJ found Plaintiff not disabled.  (Tr. 12-24).  On March 4, 2014, the Appeals Council denied Plaintiff's request for review.  (Tr. 1-4).  As such, the ALJ's decision stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled.  20 C.F.R. §§ 416.920, 404.1529.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits.  20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities."  Id.  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari,

250 F.3d 603, 605 (8th Cir. 2001) (citing <u>Nguyen v. Chater</u>, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. <u>See</u> <u>id.</u>

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). <u>See</u> <u>Steed v. Astrue</u>, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); <u>Eichelberger</u>, 390 F.3d at 590-91; <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004); <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's

RFC.  See Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5.  If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant."  Id.  See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC.").  Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence.  See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).  See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).  In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> The concept of substantial evidence is something less than the weight
> of the evidence and it allows for the possibility of drawing two

> inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence

may also support an opposite conclusion or because the reviewing court would have decided differently.   See Krogmeier, 294 F.3d at 1022.   See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating

and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints. See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. See id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show

that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used. An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which the ALJ finds credible. See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

# III.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. See Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

At the hearing, after it was established that Plaintiff earned over $12,000 in 2011, Plaintiff's attorney amended Plaintiff's alleged onset date to February 15, 2012, when Plaintiff stopped performing in-home support services. (Tr. 43-46). Plaintiff, who was born on March 10, 1974, testified that she completed tenth grade; she had no trouble reading, writing or talking to people; she was five feet six inches tall and weighed 195 pounds; she was unable to work due to back and neck pain, migraine headaches, and carpal tunnel syndrome; she could stand in one place for about five minutes before having to move; she could stand a total of twenty minutes before having to sit or lay down; walking, more than twenty minutes, caused her pain; she had numbness in her wrists, twenty-four hours a day; and she had migraine headaches at least four times a month. (Tr. 35-36, 46-55).

The ALJ found Plaintiff had the severe impairments of degenerative disc disease, moderate carpal tunnel syndrome on the right, mild carpal tunnel

syndrome on the left, her dominant hand, and status post old fracture of the fifth metatarsal base of the right foot; and Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ further found that Plaintiff had the RFC to perform medium work[1] except that she could perform no repetitive, forceful gripping with either upper extremity; however, gripping, grasping, and manipulation, which is not forceful, would not be precluded. Finally, the ALJ found that Plaintiff was unable to perform her past relevant work; that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy which Plaintiff could perform; and that, therefore, Plaintiff was not disabled. (Tr. 12-23).

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ erred in finding that Plaintiff could perform work other than her past relevant work, as the record does not support the ALJ's finding that Plaintiff's migraine headaches are insignificant, because the ALJ erred in finding that Plaintiff could use her hands for repetitive gripping, grasping, and manipulation of objects, so long as it is not done "forcefully," and because the ALJ

_____

[1] 20 CFR § 416.967(c) defines medium work as follows: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."

relied too much on the opinion of Stefan Scheidler, M.D., upon finding Plaintiff did not have significant exertional limitations. (Doc. 13 at 11-18). For the following reasons, the court finds that Plaintiff's arguments are without merit and that the ALJ's determination that Plaintiff is not disabled is based on substantial evidence and is consistent with the Regulations and case law.

## A.    Plaintiff's Credibility:

The court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including the severity of Plaintiff's alleged impairments. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010). As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ. See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882.

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported

by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered Plaintiff's activities of daily living. In particular, the ALJ considered that, on September 8, 2011, Plaintiff stated, in a Function Report – Adult, prepared prior to her alleged amended onset date, that she could do laundry, fold clothes, and mop; she could take her seven-year-old child to school, feed him, and make sure he did his homework; she went to her son's baseball games; she was able to drive her son to school and run errands; she worked for her boyfriend for "3.5 hours" a day; and that, when she worked for her boyfriend, she did household chores, prepared his medication box, and assisted him in the shower and with doctors' appointments; she sometimes cooked; and she went outside every day, drove a car, shopped in stores once or twice a month, and shopped on a computer. (Tr. 19, 205-209). Also, at the hearing, Plaintiff testified that she did her own laundry and folded it, and took care of her child by getting him ready for school, making sure he did his homework, giving him a shower, feeding him, and putting him to bed. Plaintiff also testified that she cleaned the kitchen, "every once in a while"; she dusted and "stuff like that"; and she drove a car. (Tr. 58-59, 63). See Clevenger v. Soc. Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009) (holding that cases send mixed signals about significance of daily activities, but noting claimant reported she engaged in an array of activities; it was not unreasonable under case law for ALJ to rely on this evidence to infer claimant's assertion of disabling pain was not entirely credible); Goff, 421 F.3d at 792 ("Inconsistencies

between [a claimant's] subjective complaints and [her] activities diminish [her] credibility.").

Second, the ALJ considered that Plaintiff made inconsistent statements, including those she made in the above-described Function Report, although the ALJ noted that the Function Report was completed before Plaintiff's alleged amended onset date. The ALJ also considered that Plaintiff's testimony was also inconsistent. In particular, the ALJ noted that Plaintiff reported having constant numbness in her hands, but then later stated that it came and went. (Tr. 19, 53). See Eichelberger, 290 F.3d at 589 ("We have been careful to explain that an ALJ may disbelieve a claimant's subjective reports of pain because of inconsistencies or other circumstances.").

Third, the ALJ considered Plaintiff's earnings record, with her earnings only rarely meeting the substantial gainful activity levels. (Tr. 19, 153-54). A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. See Allen v. Califano, 613 F.2d 139, 147 (6th Cir. 1980). For the same reason, an ALJ may discount a claimant's credibility based upon her poor work record. See Wright v. Colvin, 789 F.3d 847, 854 (8th Cir. 2015) (affirming where the ALJ found claimant's work history troubling for two reasons; claimant said he had not worked since 2008, but the onset of his disability was in 2010, and claimant did not report any earnings for the

tax years of 2006, 2007, and 2008, which was inconsistent with his reported work history that did not end until 2008"); Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (holding that the ALJ did not err in evaluating claimant's credibility in finding that his "sporadic work history prior to his alleged disability date" indicated that he was not strongly motivated to engage in meaningful productive activity and that this weighed against the claimant's credibility regarding his reasons for not working) (internal quotation marks omitted); Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (ALJ may properly consider claimant had not worked for several years before filing SSI application).

Fourth, the ALJ considered that Plaintiff's treatment record was not what one would expect for a totally disabled individual. (Tr. 19). A lack of objective medical evidence is a factor an ALJ may consider in determining a claimant's credibility. Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004). Although an ALJ may not disregard a claimant's subjective allegations because they are not fully supported by objective medical evidence, an ALJ may properly discount subjective complaints if inconsistencies exist in the record as a whole. Gonzalez v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (citing Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) (holding that while an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's

subjective pain complaints are not credible in light of objective medical evidence); 20 C.F.R. §§ 404.1529(c), 416.929(c)).

The ALJ, in the instant matter, considered that, prior to her amended alleged onset date, when she was treated for her back, Plaintiff had only tenderness, which was mild to moderate, initially only in her sacroiliac joint and then to her lumbar and cervical areas. She had no other positive physical or radiological findings and had an entirely normal gait. (Tr. 19). The court notes that, prior to Plaintiff's alleged amended onset date, Su Min Ko, M.D., reported, on January 18, 2011, that Plaintiff's cervical and thoracic spines were normal to palpation, without muscle spasms, or tenderness; Plaintiff's lumbar spine was normal to inspection, with no tenderness midline; in Plaintiff's lumbar spine, there was tenderness in a symmetrical distribution in the paraspinous muscles, which was mild; and Plaintiff was better in regard to activities of daily living, including her physical functioning, although her sleep patterns were fair. (Tr. 294-95). Dr. Ko reported, on April 11, 2011, that Plaintiff was doing better with activities of daily living, although her pain scale was "7"; and that she had normal range of motion (ROM), muscle strength, tone, and stability in her cervical and thoracic spine. (Tr. 304-305).

Jennifer Puckett, D.O., reported, on June 21, 2011, that Plaintiff had normal gait and overall tone of the musculoskeletal system; that a neurologic exam showed Plaintiff was alert and had normal coordination and cerebellar function;

that Plaintiff had normal ROM in her neck; that Plaintiff was generally well developed and well nourished; and that a psychiatric exam showed Plaintiff had appropriate affect and demeanor, a normal speech pattern, and normal thought and perception. (Tr. 322). On December 8, 2011, Dr. Ko reported, in regard to Plaintiff's cervical spine, that she had tenderness off midline on the right which was "mild-moderate"; that she had no muscle spasm; that Plaintiff's thoracic spine was normal to palpation without muscle spasms, tenderness, or "stepoffs"; that, in regard to the lumbar spine, tenderness was not present midline and there was tenderness of midline bilaterally in the paraspinous muscles, which was "mild"; that Plaintiff had tenderness in the hip area, on the right, which was "mild-moderate"; and that she had no tenderness in the sacral spine. Dr. Ko also reported that Plaintiff was doing better with activities of daily living; that Plaintiff's sleep patterns were "ok"; and that her pain scale was "5". (Tr. 343-46).

On January 19, 2012, which was about a month prior to Plaintiff's alleged amended onset date, S.K. Choudhary, M.D., reported that neurological testing showed that Plaintiff had "moderate to severe carpal tunnel syndrome on the right and mild to moderate on the left." (Tr. 383). On May 22, 2012, it was reported that Plaintiff's chief complaint was neck pain; she had no adverse reactions to medications; Plaintiff was negative for depression, unspecified type of arthritis, hypertension, and migraine headache; and she was to continue her home exercise

program and engage in proper lifting, carrying, postural, and ergonomic techniques. (Tr. 411-14). Records of June 18, 2012, reflect that Plaintiff had tenderness of the cervical spine, which was "mild-moderate"; that her thoracic spine was normal to palpation "without muscle spasms, tenderness or step-offs"; that Plaintiff had moderate tenderness of the lumbar spine, off midline bilaterally in the paraspinous muscles; that she had no tenderness of the lumbar spine midline; that she had mild-moderate tenderness in the hip area, on the right, but no muscle spasm; that a psychiatric exam showed normal level of consciousness, orientation, judgment, insight, memory, mood, affect, fund of knowledge, and capacity for sustained mental activity; that Plaintiff's blood pressure was 136/89[2]; that her activities of daily living were better; and that her ability to communicate was normal. (Tr. 415-19).

On July 30, 2012, when Plaintiff's chief complaint was lower back pain, Plaintiff had normal gait and station; her neurological exam showed normal mental status, motor system, sensory nerves, and reflexes; she was able to undergo exercise testing and/or participate in an exercise program; she had mild tenderness

---

[2] http://www.mayoclinic.or/diseases-conditions/high-blood-presure/in-depth/blood-presure/ART-20050982 (last accessed 08/28/2015) (systolic (top number) below 120 and diastolic (bottom number) below 80 is normal blood pressure; 120-139 over 80-89 is prehypertension; 140-159 over 90-99 is stage 1 hypertension; 160 or more over 100 or more is stage 2 hypertension; adopting a healthy lifestyle is recommended for prehypertension).

of the entire lumbar spine midline and "diffusely mild" tenderness "off midline bilaterally in a symmetrical distribution"; her neurologic exam showed normal mental status, motor system, sensory system, and reflexes; Plaintiff's activities of daily living, including physical functioning, were better; and her "overall functioning" was better. (Tr. 406-410).

On August 27, 2012, Plaintiff's blood pressure was 120/84; she had a normal mental status examination; she had normal gait; she had "tenderness in the midline at L4 – moderate," at "L5 – moderate," and "[t]enderness off midline bilaterally in a symmetrical distribution diffusely moderate hips, legs and feet"; she had a normal mental status examination; Plaintiff was to continue with home exercise, and a low fat, high fiber diet, engage in proper lifting, carrying, and ergonomic techniques, reduce her weight, and stop smoking; she was "overall functioning better"; and her pain scale was "7." (Tr. 399-403).

On September 12, 2012, Plaintiff's blood pressure was 145/102; she was "overall functioning better"; Plaintiff reported that her medications were helping, including Topomax for her migraine headaches; and her pain scale was "7." (Tr. 403-406).

On October 8, 2012, it was recommended that Plaintiff continue with a home exercise program; Plaintiff's was "overall functioning better"; Plaintiff said her medications were not helping; Plaintiff reported her pain had "slightly

improved"; her pertinent negatives included hypertension, "migraine headache," "unspecified type of arthritis," and depression; Plaintiff had *normal gait*; in the cervical spine, she had "tenderness in the midline present throughout the entire cervical spine moderate" and no muscle tenderness or spasm; in the lumbar spine, Plaintiff had "tenderness in the midline at L4- moderate," "at L5 – moderate," and "[t]enderness off midline bilaterally in the symmetrical distribution diffusely moderate hips"; she had ankle and foot tenderness; Plaintiff had a normal mental status exam; she was "overall functioning better"; Plaintiff's blood pressure was 127/88; her medications were helping; and she was advised to continue her home exercise program, eat a low fat, high fiber diet, use proper lifting, postural, and ergonomic techniques, and stop smoking.  (Tr. 394-98).

On November 5, 2012, Plaintiff's blood pressure was 140/98; she had normal gait; she had tenderness in the midline entire lumbar spine, which was moderate and "tenderness off midline only on the right diffusely moderate foot pain"; Plaintiff had a *normal mental status exam*; her physical functioning, family and social relationships were better; her mood and sleep patterns were better with medication; her pain scale was "5"; and she was "overall functioning better."  (Tr. 388-91).

A February 19, 2013 radiological report states that the impression from an examination of both Plaintiff's knees was "*early degenerative articular*

cartilaginous thinning of the medial joint compartment of both knees," no joint effusions or loose intra-articular bodies, no fractures, and adjacent soft tissue. (Tr. 460). Also, a February 19, 2013 radiological report states that the impression from an examination of Plaintiff's lumbar spine showed "small spurs on the margins of the upper lumbar vertebral bodies." It was noted that the "*[p]osterior elements remain[ed] intact*"; there was "*[n]o paraspinal swelling*"; the *S1 joints were normal*; and the impression was degenerative disc changes at L5 and S1. (Tr. 461) (emphasis added).

On February 27, 2013, Nicholas J. Tannous, M.D., reported that Plaintiff said her pain was "5/10," that it was "dull and achy," and that "all physical activities" aggravated her pain; Plaintiff's blood pressure was 117/75; Plaintiff was oriented and cooperative; Plaintiff's *lumbar/sacral spine was normal* to inspection, and showed "moderate tenderness in the center of the spine at the Level L4-L5 as well as around facet joints"; Plaintiff's neuromuscular exam was normal, with normal muscle strength and sensation; Plaintiff's *upper and lower extremities were normal*; Plaintiff's *mental status was normal*; Plaintiff's physical functioning was better; her family relationships were normal; her social relationships were good; her overall functioning was fair; and Plaintiff was advised to "do some exercises." (Tr. 456-58). On March 28, 2013, Dr. Tannous reported, in regard to Plaintiff's cervical, lumbar, and sacral spine, that they were normal; Plaintiff's range of ROM

was symptomatic with extension; she had *normal muscle strength and sensation*; her *upper and lower extremities were normal*; and she had moderate tenderness to palpation in the center of the spine at C4-C7, L4-L5, as well as around the facet joints; Plaintiff's blood pressure was 111/76; her physical functioning was stable; *her family relationships were normal; her social relationships were good; her mood was "Ok"*; and her overall functioning was fair. (Tr. 452-54) (emphasis added).

A May 30, 2013 radiological report states that an examination of Plaintiff's lumbar spine showed "*some narrowing* [at] L5 S1 disc space," *normal alignment* and *normal vertebral body heights*, and "*minimal degenerative changes* [to the] facet joints at L5 S1." The impression was *normal alignment* and "*moderate narrowing* of the L5 S1 disc space. (Tr. 446) (emphasis added). The impression from a May 30, 2013 radiological examination of Plaintiff's left and right knees was a "*normal two-view study of both knees*." Also, there was "[n]o evidence of significant arthritic spurring or bony erosion." (Tr. 447) (emphasis added).

Fifth, the ALJ considered that Plaintiff reported "regular and consistent pain modification with her medication usage." (Tr. 19). The ALJ also considered that Plaintiff's headaches were better with medication. (Tr. 15, 332-35). Conditions which can be controlled by treatment are not disabling. See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting Brown v. Astrue, 611 F.3d 941, 955

(8th Cir. 2010)); Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling). Additionally, the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention [the claimant's] having side effects from any medication."); Richmond v. Shalala, 23 F.3d 1441, 1443-44 (8th Cir. 1994).

As for the effectiveness and side effects of Plaintiff's medications, the court notes that December 2010 Psychotherapy Progress Notes reflect that Plaintiff was "doing better" with medication and that she had a good response to medication. (Tr. 256-57). Dr. Ko reported, on January 18, 2011, that Plaintiff had no side effects from narcotic medications, and that medications were helping with Plaintiff's pain. (Tr. 294-95). Dr. Ko reported, on February 15, 2011, that Plaintiff's medications helped with pain, although her pain scale was "5-6." (Tr. 298-99). On April 11, 2011, Dr. Ko reported that Plaintiff had no side effects from narcotic medications, and that her medications were helping with pain, although her pain scale was "7". (Tr. 305). On August 1, 2011, Dr. Ko reported that

Plaintiff's medications were helping with pain, although her pain scale was "6". On December 8, 2011, Dr. Ko reported that Plaintiff's "medications were helping somewhat with the pain," although her pain scale was "5." (Tr. 345). On May 22, 2012, it was noted that there were no signs/symptoms which were present at Plaintiff's last visit for which her medication was being taken, and that Plaintiff "remained symptom free." (Tr. 411). On July 30, 2012, it was reported that Plaintiff's medications were "not helping much;" and that her dosage of headache and pain medications were increased. (Tr. 408-10). On September 12, 2012, it was reported that the effect of Plaintiff's Percocet was "good"; the effectiveness of Plaintiff's pain medication was "somewhat improved"; that her chronic headaches were better with Topamax; that Plaintiff had no side effects/drug interaction of narcotics; and that her medications, including Topomax and Naproxen, were helping. (Tr. 403-406).

On November 5, 2012, it was reported that the effect of Plaintiff's Percocet was "good"; the effectiveness of her pain medications had "slightly improved"; there were no possible adverse reactions to Plaintiff's medications; Plaintiff's mood was better with Celexa; and Plaintiff's sleep patterns were "pretty good with seroquel and restoril." (Tr. 388-91). Dr. Tannous reported, on February 27 and March 28, 2013, that "all [Plaintiff's] medicines [were] helping and [her] pain [was] tolerable. The patient cannot function without medications. So keep all

[the] same meds." Also, Plaintiff had no side effects from her narcotic medications. (Tr. 458, 454). On March 28, 2013, Dr. Tannous additionally reported that Plaintiff had no side effects from any of her medications. (Tr. 452).

Sixth, the court notes that Plaintiff was repeatedly advised to stop smoking. (Tr. 298, 301, 304, 312, 317, 390, 344, 413, 458). <u>Eichelberger</u>, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments and that no physician imposed any work-related restrictions on her) (citing <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996) (claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain). <u>See also</u> <u>Wildman v. Astrue</u>, 596 F.3d 959, 968-69 (8th Cir. 2010) (it is permissible for ALJ to consider claimant's non-compliance with prescribed medical treatment).

Seventh, as discussed above, in addition to medication, Plaintiff was prescribed home exercise. (Tr. 344). <u>See</u> <u>e.g.</u>, <u>Moore v. Astrue</u>, 572 F.3d 520, 524 (8th Cir. 2009) (medication instructions to exercise are generally inconsistent with disability).

Eighth, the ALJ considered that Plaintiff had conservative treatment. In particular, the ALJ considered that, after her alleged amended onset date, Plaintiff had no physical therapy, no surgery was indicated, and she had no emergency

treatment for pain.  (Tr. 20).  Conservative treatment and no surgery are consistent with discrediting a claimant's allegation of disabling pain.  <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998).

In conclusion, the court finds that the ALJ properly considered Plaintiff's credibility, and that the ALJ's decision, in this regard, is based on substantial evidence and consistent with the Regulations and case law.

**B.    Severity of Plaintiff's Migraine Headaches:**

Plaintiff testified that she suffers from migraine headaches; that medications helped the headaches; that nothing has eliminated her headaches; and that her headaches were "horrible" and lasted for twelve to eighteen hours.  (Tr. 52-57).  Also, Dr. Scheidler, the consultative examiner, reported, in May 2013, that Plaintiff's was "severely impaired when she ha[d] flare ups of her migraine headaches."  (Tr. 477).  The ALJ, however, found that Plaintiff's headaches were not severe.  Plaintiff argues the ALJ erred in finding that her headaches were not significant.  For the following reasons the court finds that the ALJ's determination that Plaintiff's headaches were not severe is based on substantial evidence.

As stated above, at Step 2 of the sequential analysis, an ALJ is required to determine if a claimant has a severe impairment or combination of impairments.  "The severity Regulation adopts a standard for determining the threshold level of severity: the impairment must be one that 'significantly limits [a claimant's]

physical or mental ability to do basic work activities.'" Bowen v. Yuckert, 482 U.S. 137, 153 n.11 (1987) (quoting 20 CFR § 404.1520(c)). A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. See 20 C.F.R. §§ 404.1520(c), 404.1521(a). However, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007); see also 20 C.F.R. § 404.1521(a) (describing basic work activities). In other words, if the impairment has only a minimal effect on the claimant's ability to work, then it is not severe. See Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007). A plaintiff has the burden of establishing a severe impairment. See Kirby, 500 F.3d at 707.

Also, "'[a]n impairment imposes significant limitations when its effect on a claimant's ability to perform basic work is more than slight or minimal.'" Warren v. Shalala, 29 F.3d 1287, 1291 (8th Cir. 1994) (quoting Cook v. Bowen, 797 F.2d 687, 690 (8th Cir. 1986)). 20 C.F.R. § 404.1521(b) defines basic work activities as follows:

> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

First, consistent with the Regulations and case law, the ALJ found that Plaintiff's transient headache symptoms did not cause more than minimal limitations on a consistent basis for the requisite twelve months. In this regard, 20 C.F.R. § 414.909 states: "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement."

Second, the ALJ also considered that, after her alleged amended onset date, Plaintiff had had only rare medication adjustments for her headaches, and that she had improvement within less than a year after her alleged amended onset date. (Tr. 15). Notably, as discussed above in regard to Plaintiff's credibility, it was frequently reported that her headaches were better with medication. See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (conditions which can be controlled with medication are not disabling); Davidson v. Astrue, 578 F.3d at 846.

Third, to the extent Dr. Scheidler found Plaintiff's migraine headaches severe, as a consulting doctor, the ALJ was not required to give Dr. Scheidler's opinion controlling weight. Cf. 20 C.F.R. §§ 404.1527(d)(2)(i) & 416.927(d)(2)(i)

("Generally, the longer a treating source has treated [a claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion."); Martise v. Astrue, 641 F3d 909, 926 (8th Cir. 2010) ("When deciding 'how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations") (internal quotation and citation omitted). Further, it was the role of the ALJ to evaluate the record as a whole rather than rely on the opinion of a single medical source. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation). Additionally, Dr. Scheidler's opinion was inconsistent with the medical evidence as a whole, including the records of Plaintiff's treating doctors. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). See also Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). Further, it was the ALJ's role to resolve conflicts among the various physicians of record. See Tindell v. Barnhart,

444 F.3d 1002, 1004 (8th Cir. 2006) ("'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'").

In any case, the record does not reflect that Dr. Scheidler relied on anything other than Plaintiff's self-reporting for his conclusion that she was severely impaired when she had flare-ups of migraine headaches.  See Renstrom v. Astrue, 680 F.3d 1057, 1064-65 (8th Cir. 2012) (affirming where ALJ did not give controlling weight to opinion of doctor, where doctor's opinion was "largely based" on claimant's subjective complaints); McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (ALJ properly discounted doctor's opinion where evaluation was based, at least in part, on claimant's self-reported symptoms; insofar as claimant's self-reported symptoms were found to be less than credible, doctor's report was rendered less credible); Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation).

Finally, it is the ALJ's role to determine whether a claimant is disabled within the meaning of the Act.  See Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ was permitted to disregard treating doctor's conclusory statement, unsupported by the objective medical evidence, that claimant was disabled); Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)); King v. Heckler, 742 F.2d

968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, or diagnostic evidence).

In conclusion, the court finds that the ALJ's determination that Plaintiff's migraine headaches were not severe is based on substantial evidence, and that the ALJ's decision, in this regard, is consistent with the Regulations and case law.

## C.    Dr. Scheidler's Opinion Regarding Plaintiff's Exertional Limitations:

Upon determining that Plaintiff had the RFC for medium work, with the limitation that she could not forcefully grip, the ALJ considered the report prepared by Dr. Scheidler, pursuant to a consultative examination of Plaintiff.  Dr. Scheidler reported, in May 2013, that, on examination, Plaintiff's bilateral hands could be fully extended and fists could be made; her grip strength was 5/5 in the right hand; all Plaintiff's fingers could oppose; and Plaintiff had normal range of motion in all joints of the fingers of both hands.  (Tr. 476)  Additionally, upon examination, Dr. Scheidler reported that Plaintiff was in "no apparent distress"; she "did not appear to be in pain supine, standing, or [in a] seated position"; she ambulated without assistance; her shoulders, elbows, and writs were non-tender; Plaintiff's legs and calves revealed no tenderness, warmth, or swelling; there was no tenderness, swelling laxity, or crepitus of the hips, knees, feet, or ankles; Plaintiff had no

tenderness over the spinous processes and no paravertebral muscle spasm; in the dorsolumbar spine, Plaintiff had pain in the lumbar spine with flexion, no pain with lateral flexion or extension, no evidence of paravertebral spasm, no tenderness over spinous processes; her straight leg raise was negative on both sides; Plaintiff could ambulate unassisted; her gross sensation was intact; she held on "when balancing on one foot and squatting or rising from [a] squatting position"; she was "able to perform tandem walk and heel-to-toe walk"; and her skin sensation was intact.  In addition to finding that Plaintiff was "severely impaired when she has flare ups of her migraine headaches, as discussed above, Dr. Scheidler concluded that Plaintiff "appeared unbalanced with activities requiring squatting, stooping, kneeling or crawling," and Plaintiff had no limitation with sitting, standing, walking, lifting, carrying, handling objects, hearing, or speaking.  (Tr. 475-77).

Dr. Scheidler also completed a questionnaire in which he opined that Plaintiff could continuously lift or carry up to 20 pounds, frequently lift or carry up to 50 pounds, and never lift more than 50 pounds; Plaintiff could sit, stand, or walk 3 hours, without interruption; in an 8-hour work day, Plaintiff could sit or stand for 6 hours and walk for 4 hours; and she did not use a cane to ambulate.  (Tr. 468-69).

The ALJ found that Dr. Scheidler's findings upon examination were consistent with Plaintiff's radiological and tenderness findings, and he, therefore, gave greater weight to Dr. Scheidler's actual lifting restrictions than to his

statement that Plaintiff had no such limitations. (Tr. 21, 468, 477). As for Dr. Scheidler's restricting Plaintiff to walking for no more than 4 hours, the ALJ reasoned that it was unsupported by the record, including any positive gait or neurological findings by Dr. Scheidler or other medical sources. (Tr. 21, 469). See Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ was permitted to disregard treating doctor's conclusory statement, unsupported by the objective medical evidence, that claimant was disabled); Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). See also Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.").

Further, Dr. Scheidler's walking restriction was indicated simply by a checkmark on a form. See Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011) (holding that checkmarks on a Medical Source Statement are "conclusory opinions" which can be discounted if contradicted by other objective medical evidence); Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) ("'The checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value.' . . . Indeed, '[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.'") (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) and Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996)).

Thus, the ALJ afforded little weight to Dr. Scheidler's opinion that Plaintiff was limited to walking a total of 4 hours in an 8-hour work day.

Notably, to the extent Plaintiff contends the ALJ gave improper weight to Dr. Scheidler's finding that Plaintiff had full grip strength in her right hand, the ALJ actually limited Plaintiff's ability to grip to non-forceful gripping. Indeed, the record does not reflect that Plaintiff's ability to grip was any more limited than the limitation found by the ALJ.

The court finds that the ALJ provided good reasons for the weight given to various aspects of Dr. Scheidler's opinion. See Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, or diagnostic evidence). Additionally, the court finds that the ALJ's decision to partially credit Dr. Scheidler's opinion is based on substantial evidence and that Plaintiff's arguments to the contrary are without merit. See Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) (ALJ's decision to partially discount consultative physician's opinion was proper; substantial evidence supported ALJ's decision to reject physician's suggested 4-hour sitting limitation, and substantial evidence

supported ALJ's inclusion of physician's suggested 6-hour sitting limitation in claimant's RFC).

## D.    ALJ's Determination that Plaintiff had the RFC to Perform Medium Work With No Forceful Gripping:

Plaintiff's contention that the ALJ's determination that she can perform medium, work with no forceful gripping is not based on substantial evidence. (Doc. 13 at 13-18).  As stated above, medium work involves lifting no more than 50 pounds at a time, with frequent lifting or carrying objects weighing up to 25 pounds.  A person who can perform medium work can perform sedentary and light work.  20 CFR § 416.967(c).  For the following reasons, the court finds that the ALJ's determination that Plaintiff had the RFC to perform medium work, with no forceful gripping, is supported by substantial evidence.

As discussed above in regard to Plaintiff's credibility, the ALJ considered that Plaintiff's treatment records for her complaints of back, neck, and hip pain were not what one would expect for a person who was totally disabled.  As considered by the ALJ in regard to Plaintiff's back pain, in January 2012, just prior to Plaintiff's alleged amended alleged onset date of February 15, 2012, Plaintiff had mild tenderness in her right sternocleidomastoid area, moderate paraspinal tenderness in the lumbar spine, and mild hip tenderness, with no sacral spine tenderness.  (Tr. 19, 340).  The ALJ also considered that Plaintiff generally continued to have pain in the mild to moderate range in these areas and was treated

with medication. (Tr. 19). In July 2012, Plaintiff had normal gait, her physical functioning was better, and she was told to continue with home exercise as tolerated. (Tr. 409-410). In November 2012, Plaintiff had normal gait and tenderness only in the midline lumbar spine, which was moderate, and "diffusely moderate foot pain." (Tr. 390). In February 2013, Plaintiff's lumbar/sacral spine was normal to inspection and her neuromuscular exam was normal. (Tr. 456-58). Also, Plaintiff's February 2013 lumbar spine radiological report showed only small spurs, no paraspinal swelling, intact S1 joints, and intact posterior elements. (Tr. 461). In March 2013, Plaintiff's cervical, lumbar, and sacral spine were normal; she had normal muscle strength and sensation; and she had moderate tenderness to palpation in the center of her spine. (Tr. 452-54). Significantly, May 2013 radiological testing of Plaintiff's spine showed normal alignment and moderate narrowing at L5-S1. (Tr. 446).

As for Plaintiff's knees, February 2013 radiological testing showed only early degenerative articular thinning, with no joint effusions or loose intra-articular bodies (Tr. 460), and May 2013 radiological testing showed a normal study of both knees (Tr. 447).

As for Plaintiff's foot pain, the ALJ considered that, in November 2012, she was referred to a podiatrist; that she had only one podiatry appointment, with minimal findings; that the podiatrist opined that Plaintiff's symptoms should

disappear; and that subsequent treatment notes showed no gait abnormalities. (Tr. 20). The record reflects that Plaintiff told the podiatrist that she had surgery a decade earlier and that she reinjured her foot three months before seeing the doctor. On examination, Plaintiff had mild pain to palpation of the fifth metatarsal base of the right foot, with no obvious deformity, and she had no ROM abnormalities. Radiographic studies showed an old fracture, a headless screw with no evidence of migration, a fracture line that demonstrated a nonunion with sclerosis of the line, and a retained piece of bent wire. The podiatrist advised immobilization and indicated a likelihood that the scar tissue would re-adhere and that Plaintiff's symptoms would disappear. (Tr. 20, 385-86, 390-92). The record does not reflect that Plaintiff sought treatment with a podiatrist, although other medical records of January 2013 state that Plaintiff was following up with a podiatry referral and "might have another x-ray." (Tr. 427).

As for Plaintiff's allegations of wrist and ankle pain, the ALJ considered Plaintiff's testimony that she had wrist problems and had to sleep in braces, and that she had daily pain going into her hand, numbness in her first two fingers, and that her hand went to sleep all of the time. (Tr. 18, 52-53). As considered by the ALJ, a January 2012 electromyography/nerve conduction study (EMG/NCS) showed moderate to severe carpal tunnel syndrome on the right and mild to moderate carpal tunnel syndrome on the left. (Tr. 20, 382-83). As also considered

by the ALJ, other than some general hand pain in early 2012, Plaintiff did not report specific hand-related symptoms, and, on April 24, 2013, Plaintiff's upper extremity examination was normal. (Tr. 448). In any case, as stated by the ALJ, he accounted for positive EMG/NCS findings in Plaintiff's RFC by restricting her from repetitive, forceful gripping with either upper extremity. (Tr. 17, 21).

To the extent Plaintiff claims the ALJ did not sufficiently define what he meant by forceful gripping, and that, therefore, his decision is not based on substantial evidence, this court has affirmed an ALJ's decision where the ALJ imposed a limitation of no forceful gripping. See e.g., Mannisi v. Astrue, 2008 WL 441767, at *18 (E.D. Mo. Feb. 14, 2008) (finding substantial evidence supported the ALJ's determination that the claimant should "not constantly and forcefully grip/grasp with her right hand"). Moreover, the record does not reflect that the VE had difficulty understanding the terms used by the ALJ to describe Plaintiff's limitations. In any case, the VE identified representative occupations that would be available in the event Plaintiff were further limited to light or sedentary jobs, with only occasional gripping, grasping, fingering, and feeling. (Tr. 23, 72-75).

As required by the Regulations, upon determining that Plaintiff had the RFC for medium work, without repetitive, forceful gripping with either upper extremity, the ALJ considered the extent and severity of Plaintiff's impairments. See 20

C.F.R. § 404.1545(a) (defining RFC as "what [the claimant] can do" despite his or her "physical or mental limitations"). Further, the ALJ considered the combination of Plaintiff's impairments, see Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) ("When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments."), and the ALJ reached his conclusion based on all relevant, credible evidence in the record, see Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.") (internal quotations omitted); see also Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013).

To the extent Plaintiff contends that the ALJ's decision is not supported by substantial evidence because it does not completely mirror the opinion of a particular medical source, in formulating a claimant's RFC, the "ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011). After considering all evidence of record, including the medical evidence and Plaintiff's credibility, the ALJ executed his primary responsibility for determining Plaintiff's RFC. See Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for

determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591. As such, the court finds that the ALJ's RFC determination, including that Plaintiff could perform no repetitive, forceful gripping with either upper extremity, is based on substantial evidence and that it is consistent with the Regulations and case law.

**E.    ALJ's Opinion that Plaintiff Could Engage in Work Other Than Her Past Relevant Work:**

20 C.F.R. § 404.1560 states in relevant part in regard to a claimant's ability to perform past relevant work:

(b)  Past relevant work ...

(2)  Determining whether you can do your past relevant work.  We will ask you for information about work you have done in the past. We may also ask other people who know about your work.  (See § 404.1565(b).)  We may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity.  A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy.  Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work.  In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the

claimant actually performed it or as generally performed in the national economy.

. . . .

(c)  Other work:

(1)  If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work.  We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience.  Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

(2)  In order to support a finding that you are not disabled at this fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors.  We are not responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work.

Consistent with the above quoted Regulation, the ALJ, in the matter under consideration, asked a VE if Plaintiff was capable of performing her past relevant work, and the VE testified that Plaintiff could not do so.  (Tr. 70).  As required by the Regulations, the ALJ then proceeded to ask the VE if there was work in the national economy which a hypothetical person of Plaintiff's age and with her education, work experience, and RFC could perform.  The VE testified that there were such jobs available, including a marker and a laundry worker.  (Tr. 70-71).

Pursuant to questioning by Plaintiff's attorney, the VE also testified that, even if Plaintiff were limited to occasional gripping, grasping, fingering, and feeling, given her ability to perform medium work, and her age, education, and work experience, there was work in the national economy which she could perform, and that these jobs included furniture rental consultant and "investigator dealer accounts." (Tr. 72-73).

Based on the VE's testimony, the ALJ concluded that there was work which Plaintiff could perform. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("Based on our previous conclusion . . . that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). In conclusion, the court finds that the ALJ's determination that Plaintiff could perform work other than her past relevant work is based on substantial evidence and that the ALJ's decision, in this regard, it is consistent with the Regulations and case law. Because the ALJ found that there was work which Plaintiff could

perform, the court finally finds that the ALJ's determination that Plaintiff was not disabled is based on substantial evidence and consistent with the Regulations and case law.

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint (Docs. 1, 13) is **DENIED**;

**IT IS ORDERED** that a separate judgment be entered incorporating this Memorandum and Order.

Dated this 28th day of August 2015.

/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE